First roll of first case. 311-207 Chicago Bridge & Iron Co. v. Jury Attorneys Good morning, Your Honors. May it please the Court, my name is Steve Martella. I represent Chicago Bridge & Iron, the plaintiff in this matter, counsel. Your Honors, we are here because our client filed an appeal to this Court of the Industrial Commission decision which reversed and modified the arbitrator's decision. Circuit Court also affirmed the Commission decision. Your Honors, just briefly, the Commission decision which is in question from our perspective today was not supported by the evidence. Specifically, the Commission awarded two weeks of TTD from February 23, 2007 through March 8, 2007. There is no documentation, there is no evidence in the record to support that particular award. Very arbitrary on their through June 16, 2009, a total of 37 weeks. How they came up with that date, those dates, those weeks, again, arbitrary. There is no evidence in the record to support that. They came up with some date, they decided they were going to find the petitioner more credible and based on his testimony and the speculation of when he could have returned to work, they also they awarded vocational assessment that the respondent, that is, I'm sorry, the petitioner and the defendant were going to get together and discuss scheduling a vocational assessment. Again, we're talking about a defendant here, Mr. Jerry Evans, who had indicated prior to his work accident that he was going to retire. He spoke with not just one individual, he and he spoke with Mr. Beck. And prior to his work accident, he had a discussion with Mr. Beck. His work accident, your honors, as you know, was on January 7, 2007. Around Christmas time 2006, he had a specific discussion that was testified to by Mr. Beck. The discussion focused on Mr. Evans, the defendant, indicating he was going to retire. Advising that he was not going to be working after the Ludington job, which ended on February 22, 2007. All right. So is there not some contrary evidence to that as well? Didn't the claimant testify that he was planning on retiring, but he hadn't made a definitive decision? He did say that, your honor. In fact, his testimony appears to jump from one thing to another. But he is, what we can say about the petitioner is that he is not consistent. What we can say about the petitioner is that on the one hand, he denies that he was capable of doing the Ludington job as a supervisor because he has restrictions. And then on rebuttal testimony, he says, oh, I actually was able to do that particular job. So he's not consistent as far as that's concerned. And as far as the petitioner's testimony about whether or not he intended to retire, not only did he have this discussion with Mr. Beck prior to this accident in 2007, January of 2007, he had a discussion with Mr. Beck and with Mr. Liske where they discussed Mr. Beck or Mr. Liske and Mr. Beck discussed with Mr. Evans that they didn't want him to retire. They wanted him to do this job in Darien, a Darien job that would have been within his restrictions. They said to him, don't retire. And he discussed with them the problems that he was having in terms of his wife and he wanted, his wife wanted him to be, to quit working. He had been traveling for so many years. That was unequivocal by two individuals, Mr. Liske and Mr. Beck. Let's assume for the sake of the argument, cutting to the chase, there's conflicting evidence on that issue. Yes, sir. As we know, it's within the province of the commission to weigh, resolve conflicts in the evidence, weigh the credibility and believability of the witnesses, and obviously they believe the claimant. So why is an opposite conclusion clearly apparent on a credibility question? Sure, Your Honor. In this situation, we're talking about the manifest weight of the evidence. The petitioner's testimony is the sole testimony in this case that you can rely on to say that the petitioner did not retire, that the petitioner is entitled to TTT benefits of two weeks, that the petitioner is entitled to the maintenance benefits. That's the only testimony, but his testimony was consistent. His testimony was not corroborated by his own handwritten documentation where he indicated immediately after this accident, he submitted a CBNI pension request. He applied for that on January 15, eight days, approximately seven to eight days after the alleged work accident, he applied for retirement benefits. So not only did he tell Mr. Beck prior to the accident that he was going to retire, Mr. Beck and Mr. Liske have a discussion with this petitioner immediately after the accident telling him please don't retire, but he also applied for pension benefits. Because he intended to retire and that was the position. He did not want to work after January 22, 2007, because that was the last day of the Ludington job. He intended to retire. And in fact, when he submitted, when he submitted, I'm sorry, February 22, 2007, when he submitted the CBNI pension request form, he put on there that he was going to retire as of March 1, 2007. Did he receive retirement benefits? As far as we know, yes, Your Honor. There's no indication to the contrary. Is there any indication that he did? Yes. Is there any indication in the record that he did receive retirement benefits? Your Honor, what we have in the record is not that he did or did not receive those benefits. What we have in the record is that he repeatedly refused to accept a job within his  Why? Repeatedly refused to accept it, because he was going to call the union to find out how that would impact his pension benefits. He knew he was going to get those benefits and he was afraid of how this particular job might impact that. Because he, if he were to receive any money working after he's receiving pension benefits, there would be a direct payback to the pension. And that was a concern of his. Wasn't there some conflicting evidence on whether or not he took the Darien job as well? Didn't he testify that he told the supervisor he would be physically unable to do the job as planned, but would accept the job if his duties were limited, consistent with his abilities? So was he sort of equivocal about whether or not he would take it? He didn't just turn it down outright, did he? That was his testimony, Your Honor. You're right. That was his testimony. However What was the doctor's note, say, in February of 2006? 2008? If you're talking about Dr. Howard, Dr. Howard, on January 9, 2008, his tweeter wrote that the petitioner had not, I'm sorry, that Mr. Evans had not returned to work because he was retired as of February of 2007. If you're talking about what he told the plaintiff's IME doctor, Dr. Hagman, on October 8, 2008, he told them that he had retired from work and his last day of work was in February of 2007. He had restrictions set. February 6, 2008, his doctor's notes say, quote, on discharging the claimant he stated he'd like to return to duty. However, he wanted work-related restrictions because he cannot lift. Okay. Your Honor, if you look at that one document and we don't look at the rest of the documents and you don't look at his own handwritten pension submission form, I think, Your Honor, after that we're still talking about a petitioner, Mr. Evans, who spoke with other doctors and told them that he had retired from work. Whether he intended to return to work for this particular employer or another employer, that's his own business. He had retired from his position with the Chicago Bridge and Iron. He was no longer employed by them. Chicago Bridge and Iron had taken steps after he stopped working for them and Chicago Bridge and Iron submitted paperwork that indicated he had retired from his position with them.  I'm sure you noticed the commission, there was a two-to-one decision. And two of the commissioners decided to modify the decision, as I've indicated earlier, but one of the commissioners, Commissioner Lindsey, wrote a very good dissent. And, Your Honors, I'd like to at least highlight what she had indicated, and I think that it would at least illuminate our position a little bit better. Specifically, she succinctly indicated, at least from looking at the evidence and listening to what, I'm sorry, and reading the documentation, that the petitioner, that is, Mr. Evans, had removed himself from the workforce, that he did not accept the job offers when they were posed to him. That is, the Darien job offer when it was posed to him. And by the time he did turn around and say that the union would allow him to take that job, I believe that's unequivocal as well, he did say that. When the union would allow him to take that job because he had filed for retirement, he was getting these pension benefits, he was concerned, by that point it was too late. How long is an employer supposed to keep a job open when they make a light-duty job offer? The employer at that juncture, when Mr. Evans made it clear that he was not going to come back, they didn't have to keep that job open. They gave it to somebody else. They went to him multiple times, multiple discussions, and asked him to take this job, and he said, I cannot do it because I have to talk to the union. When the employer called him in the beginning of 2008 and said, we may have a job available, working four to six months, starting in the fall, and he immediately said, I think I'll take that job, and they had someone come back who was actually employed by Chicago Bridge and Iron that came back in the interim. I mean, literally within the testimony is not succinct about that issue, but it does indicate that Mr. Leske called Mr. Evans and said, I have a job offer for you if you'd like to come back to work for us sometime in the fall. What did he say? I'm sorry, Your Honor? What did he say? I'd like to take that job? He said, I'd like to take that job. Does that sound like he's retired? Your Honor, this was the employer calling him and saying, because they like this gentleman. He worked for them for 27 years, Your Honor. He didn't have to call. The employer, here's where I get bogged down with this case. If the employer had never called him, would the commission have awarded 37 weeks of maintenance? The employer didn't have to call him. Would the commission have awarded 37 weeks of maintenance starting the fall of 2008 through the date of the trial? In fact, the commission awarded maintenance benefits after the date of the trial. It went two weeks past the date of the trial. I don't think so. So that to me is speculative on the part of the commission to even award those benefits to begin with. If the employer already knew that Mr. Evans was no longer employed by them, they liked him enough to give him a call. If he wanted to come back, that's great. If his condition had changed, that's great. They weren't obligated to actually offer him that job, number one. Number two, when an employee returned from overseas to accept that job, they said, you know what, we have no obligation to Mr. Evans. We're going to give it to this other employee. So when the commission awards 37 weeks of maintenance and they say we're going to start October the 1st, where did they get that date? When they award 37 weeks, how did they figure that out? Where does that come from? And what about those benefits in between those periods of time? If you're going to tell me that the commission awarded proper benefits here, what about all the time in between? They awarded two weeks of TTD immediately after Mr. ______. Two weeks of TTD from February 23, 2007 through March 8, 2007. And then they awarded maintenance from October 1, 2008 through June 16, 2009. What about between March 8, 2007? And if we're going to follow the rationale of the commission, what about between March 8, 2007 through October 1, 2008? What happened to those benefits? Was he still not, according to Mr. Evans, was he still not disabled? Was he still not retired? So what I'm saying, Your Honors, is I believe that the commission decision overreaches by a great margin the evidence that was presented at the trial. I believe that Mr. Evans did not present credible testimony. I believe, and I ask Your Honors to modify, reverse the commission's decision in that respect. The arbitrator was very succinct in the way he analyzed the evidence that was presented before him. Commissioner Lindsey reviewed the record and also sided with the arbitrator. We had two other commissioners who said, well, we're going to make these general awards that have no basis in fact, and that's why we're here today, Your Honors. When you argued the case before the commission, did you specifically argue or challenge the computations in the setting of the TTD, or did you argue that he was retired, period, therefore he should get nothing? What did you argue? Oh, I argued both, Your Honor. When I stepped up to brief... Where in your brief did you discuss the computations? Your Honor, in terms of computations, I argued that in a general sense, that they shouldn't have awarded any of those particular... No, we understand your argument is that he should have gotten nothing because he was retired. But that wasn't the question I asked you. Where in your brief did you discuss there's an incorrect computation of his TTD time or his maintenance time? Oh, I repeatedly mentioned, I repeatedly state that they shouldn't have awarded any benefits. So therefore... So there's no benefit at all. If you're talking about an actual dollars and cents, I did not. Because my position is, our respondent's, sorry, the employee's position is, that they shouldn't have awarded those benefits to him. So you never attacked the computation. The only thing you attacked was entitlement to benefits at all. Correct, Your Honor. Okay. Correct. And what I'm saying is, the only reason I mentioned it... Counsel, your time is up. You'll have time on rebuttal. Thank you, Your Honor. Counsel, please. May it please the Court. Good afternoon, Your Honors, Counsel. My name is Nigel Smith, and I represent the injured worker, Jerry Evans, the defendant, Apple Lee. I wanted to try a slightly different approach to this oral argument today. I wanted to identify a theme to help us think about the case. And just the other day, millions of... You did have inspiration the other day, is that it? I did have inspiration the other day. It's called the Super Bowl. I could do the Super Bowl shuffle for us. No, I wouldn't torture you that way, Your Honor. But in the Super Bowl, sometimes they have funny commercials or entertaining commercials. And one of those commercials this year starred the famous actor and director Clint Eastwood. And some of us might even remember one of his earlier movies, one of the spaghetti westerns, named The Good, the Bad, and the Ugly. I like the fistful of lasagna better myself. Dr. Taylor, the argument, please. And that's what this case reminds me of. The Good. Mr. Evans was a good worker. He worked in the union and the Respondent for over 27 years. He was closing in on 30. I think he had 27 1⁄2 in. Respondent's own witness testified what a good worker he was. And if he wasn't good, wasn't a good worker, he wouldn't have lasted 30 years or 27 years in that business or with the Respondent. The Bad. This is a bad injury. Actually, after the 19B trial, he underwent a back fusion. And what's more, this is a bad decision by the arbitrator. Well, that's all well and good. But tell us why he was not retired. He, well, to answer Your Honor's earlier question about whether he was actually even getting retirement benefits, I looked through the transcripts, read them all. I couldn't find it in there. Maybe I overlooked it, but I couldn't find, you know, that he was actually getting retirement benefits. I know he had looked into retirement. And also, I mean, when the Social Security Administration mails those annual statements to you, I'm sure we all have, you know, checked those out and are interested to know what we would get if we were to retire today or retire down the road at this rate or if we were to become disabled today. You know, just because someone's looking into their retirement benefits doesn't mean they're going to retire. And actually, Your Honor, to answer your question, on page 103 of the arbitration transcript, he says, quote, I would have liked to continue working, yes. Some of the other bad parts of this decision is the only reason he had to take retirement benefits, if he did indeed get them, was due to this injury. He may have inquired into what his benefits would have been, but there would have been no need to take the retirement benefits had he not been injured and not been able to return to his usual job. Was there any evidence in the record to corroborate the argument, the claimant's statement, that he was thinking about retiring or planning but still wanted to work? Is there some documentation somewhere to corroborate that? I'm not sure of any documentation that says that. But we can look at the facts of the case. I mean, the thought that kept going through my mind when I first was assigned this case is, why would the respondent keep calling him to have him come work for them if he was retired? If he's retired, he's retired. He's done. But they kept calling. There's about two or three different jobs. Employers hire retired employees all the time. Caterpillar is known for it. A lot of companies do. So, I mean, they hire them on a contract basis, et cetera. So, I mean, that's just the way it is today. Well, point well taken, Your Honor. I would just go back to the fact that, you know, he testified that he would have liked to have continued working. And also they were trying to arrange work with his son. They had that whole nepotism thing they were trying to work out. So let me understand this. If he says, and there seems to be some evidence here through his testimony and others, that I have this injury. I'd like to continue working. But I guess I'm going to have to take retirement. And let's say he takes retirement. Does the act say no longer can you recover from that injury? I don't think it says that, Your Honor. I think the appropriate step would be for the respondent to offer vocational assistance if his injury precludes him from doing his usual and standard job that he was doing. And this is, you know, he was not going to end up being an odd lot total perm. He had skills. He had talent. There's probably a lot of jobs he could have done had they just taken or made the effort, made the attempt to help him and provide some vocational assistance to him. And also you have to remember this was a 19B. You know, like I said, he still had the other surgery. We haven't even gotten to the permanency aspect yet. So the fact he might be retired doesn't preclude some of those benefits, am I correct? Right. I think he should have gotten even more benefits, actually. I think they should have been invoking him. But, I mean, as a matter of law. Yes. Right. I think they should have provided vocational assistance and also, you know, paid him maintenance. Well, vocational assistance if he takes retirement, wouldn't that be one of the benefits you kind of questioned? Pardon? I mean, if he triggers retirement and he's actively, quote, if that's the proper term, actively retired, why vocational? Well, judging from the record, I'm not sure that he really was retired. I think that's one question that. Yeah, that's up in the air. I agree with you at this point. I agree. But assuming that he was, why voc? Well, if he was actually retired, maybe he wouldn't be entitled to that. But I'm just not so sure he was retired based on the record. Well, based on the record, which is all we have to go by. Did he actually testify? Pardon me? Did he testify? Did he testify? Yes. He testified, yes. And so nobody knows if he's retired. Well, he said that he'd like to continue working. I read through that looking for that part, and I didn't see it. I mean, maybe it's because I was reading it late at night. I want to try. We keep talking about he's offered a job. Let's figure out which jobs he's offered. Okay. The man is injured on, what, January the 8th, 2007? That's right. He finished that job, did he not? I believe he did. He worked through that job. He was restricted, as I understand it, from doing anything but light-duty work. His doctors restricted him? Right. And I believe the respondent's doctor made the same restrictions. All right. After he completed his job, the dairying job came up. Is that correct? That's correct. And he was offered the job. Yes. I think they refer to that as the jack job. Did he testify that he was physically unable to do the job, but he accepted, if the duties were limited to his advising and training other workers? That's my understanding. Did he testify to that? That's my understanding, yes. Okay. And did Leiske offer to hire his son if he would accept the dairying job? I think that's kind of up in the air. I mean, they were talking about this nepotism, anti-nepotism policy with the respondent. And Leiske asked him to start the dairying job until he could find another supervisor? I think so, yes. He agreed to that, but said that he had to contact the union to stop any steps that he had taken for pension purposes? I believe he was concerned about his pension, yes, sir. Okay. And closer to the start of the dairying job, Leiske never called him back. Is that right? And then did call him back and tell him that he didn't have to show up for work, send his telephone back, give his credit card back, and have a good life, I think was the testimony? Right. That was in there a couple of times. Yeah. And one week later, Leiske called him to try and smooth things over? Right, because apparently Mr. Evans thought that Leiske had hung up on him or had disrespected him during that conversation. Can it testify specifically that he was willing to work in January and February of 2007 if they would give him work within his restrictions? I'm not sure about that without going through the testimony again, but I do know he did say he would have liked to continue working. I have that as a direct quote from page 103. In 2008, did Leiske call him again and offer him a job in Michigan? I believe they discussed that. It was a Dow Chemical job, I believe. Did he testify that he told Leiske he'd be interested in the job but never heard back from Leiske? I believe that's one of the things that's up in the air as far as the factual determinations made by the arbitrator and the commissioner. So I was going to say, to finish my theme about the ugly, I personally thought the ugly part was the dangling of jobs in front of him and then they kind of pulled him away so he couldn't go and work those jobs. What the respondent really should have done is offer vocational assistance if they knew that he would not be able to do the type of work he had been doing all that time. But the bottom line really is this, and this was addressed by the circuit court judge in his decision that the respondent is currently appealing. Judge Brandt wrote that under the law, the commission may set aside the arbitrator's decision because it chose to find Mr. Evans more credible. That's from the Paro case. The evidence in that case and in this case could conceivably support a variety of inferences and reviewing courts will not substitute their judgment for that of the commission merely because they might have drawn different inferences or conclusions from the same record. And that's the standard. Is there enough evidence to support the commission's decision? In this case, I think there is. The commission found that Mr. Evans was more credible and ruled in his favor. I think the commission got it right in at least three ways that the arbitrator did not. They vacated the order to repay the almost $9,000 that he received in PPD advances. Apparently he had showed up for trial four times, I think, which I know you don't always get a trial when you think you're going to. That's understandable. So they gave him a couple of PPD advances. The arbitrator ruled he had to pay that back. The commission said, no, you don't. The respondent will get it back as a credit, which is proper. The commission also found him to be more credible than the respondent's witnesses, and they ordered that a vocational assessment be prepared. And actually, if that had been done when first requested by Mr. Evans and his attorney, we wouldn't even be here today. So what I would ask is that the decision of the circuit court, which affirmed the decision of the commission, be affirmed with the possible adjustment of the TTD or maintenance benefits, because it's our position since he, in his condition, had not reached a state of permanency that he is still entitled to those benefits. You want us to award additional TTD? I would think he'd be entitled to maintenance while they're, or TTD maintenance, whatever you want to call it. And that's the same percentage while they help him find a job. That's a matter for the commission. That's not our job. Yeah, we can't do that. Well, I mean, remand it back to them for further findings on that issue. That's a waiver request. Rebuttal, please. Your Honors. I just want to make sure that we don't confuse whether or not he retired because of his work accident or retired of his own volition, intended to retire prior to his work accident. You'll note, Your Honors, that the documentation that he submitted was on January 15, 2007, talking seven days after a back sprain strain. He had a work injury that caused a back sprain strain. One week later, he submits his documentation to get his pension benefits because he intends to retire. He puts on there that he's going to be retired as of March 1, 2007. There's no confusion there. He's not a doctor. He doesn't know he's going to be off work for the next week or two or month or year. He doesn't know he's going to have fusion surgery. He's not a doctor. He intended to retire. That's why he submitted that documentation. That's why he spoke with Mr. Beck before his work accident and said, I intend to retire. That's why Mr. Beck and Mr. Liske met with him in Plainfield. They met with him and they said, we don't want you to retire. We'd like for you not to retire. We want you to continue working for us. So they went above and beyond. And the idea that the employer dangled any jobs in front of this person is, Your Honors, I was at the hearing. I heard the testimony. And that was the furthest thing that I think the arbitrator thought, that Mr. Evans thought, that Mr. Strong thought, and certainly that I thought. So from our perspective, Your Honors, the retirement was entirely voluntary. The Petitioner, that is Mr. Evans, indicated that he had retired to two different doctors after the work accident. He told Mr. Liske, he told Mr. Beck that he intended to retire. He went further and he actually submitted documentation that evidenced his desire and intention to retire. And he specifically stated he was retired as of March 1, 2007. To hold the Respondent liable for a decision by this Commission that, again, is not grounded in fact, that seems to be arbitrary at best in terms of the dates on which the TTD and the Petitioner met, seems unreasonable. And it seems to, in my perspective, Your Honor, it would have a quelling effect on business in Illinois. I'm not sure that it's a very positive message to be sending to employers when they call a good employee a year after he has a work accident and they like him. They want him to come back. Would you like to accept this job? And for anyone to, at this juncture, say that for that employer to like this employee and to call him back, entitle that employee, as the Commission found, entitle that employee to maintenance benefits beginning on some arbitrary date, that doesn't seem to make much sense. So we ask Your Honors to please reverse the Commission decision, reverse the District Court decision, affirm the arbitrary decision. Thank you, Counsel. Thank you, Your Honor. The Court will take the matter under advisement for disposition.